UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -against-

LATIQUE JOHNSON,

        Defendant.

No. 16 Cr. 281 (PGG)

**MEMORANDUM OF LAW IN SUPPORT OF**
**THE DEFENDANT'S MOTION FOR A NEW TRIAL**
**BASED ON NEWLY DISCOVERED EVIDENCE**

Ezra Spilke
1825 Foster Avenue, Suite 1K
Brooklyn, New York 11230
(718) 783-3682
ezra@spilkelaw.com

*Counsel for Latique Johnson*

-i-

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................ ii
**PRELIMINARY STATEMENT** ........................................................................................... 1
**BACKGROUND** .................................................................................................................... 1
**ARGUMENT** .......................................................................................................................... 4

-ii-

# TABLE OF AUTHORITIES

Cases

*United States v. Forbes*, 790 F.3d 403, 406–07 (2d Cir. 2015) ...................................................... 5
*United States v. Johnson*, 452 F. Supp. 3d 36 (S.D.N.Y. 2019) ..................................................... 1
*United States v. Owen*, 500 F.3d 83 (2d Cir. 2007) ....................................................................... 5

Other Authorities

Fed. R. Crim. P. 33 .......................................................................................................................... 1

## PRELIMINARY STATEMENT

Latique Johnson moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure based on newly discovered evidence. *See* Fed. R. Crim. P. 33(a), (b)(1). Mr. Johnson's conviction of Count 3 was based on the testimony of two cooperating witnesses that differed in material respects. Count 3 concerned a shooting that happened in the fall of 2012. The government advanced a nonsensical theory of the shooting involving convoluted duties that one gang member owed to the gang. The defense maintained that the shooting was a personal matter involving the family of one of the cooperating witnesses – Michael Adams. New evidence has come to light vindicating the defense's theory.

By sworn declaration, Stephen Adams, the brother of cooperator Michael, attests that he himself perpetrated the shooting and that he did so to avenge his and Michael's cousin. This is consequential, new evidence that the jury did not have the opportunity to evaluate. For the reasons that follow, the interest of justice compels vacatur as to Count 3 or, in the alternative, an evidentiary hearing at which Stephen Adams would testify.

## BACKGROUND

On March 27, 2019, a jury convicted Mr. Johnson of five counts stemming from his involvement with and leadership of the Blood Hound Brims. Count Three, which is relevant here, charged Mr. Johnson with assault and attempted murder in aid of racketeering. By a special finding, the jury found that Mr. Johnson had committed or aided and abetted attempted murder but not assault. ECF No. 570.

The facts at trial were as follows. Two of the government's witnesses – Michael Adams and Manuel Rosario – testified that in Fall 2012, BHB members did a drive-by shooting of two members of the MacBallas. *United States v. Johnson*, 452 F. Supp. 3d 36, 64 (S.D.N.Y. 2019). According to Adams and Rosario, the shooting was part of the war between the BHB and the

MacBallas. *Id.* at 53. According to Adams, Mr. Johnson gave the order to Saeed Kaid to do the shooting. *Id.* at 54. Rosario recalled Mr. Johnson speaking to Kaid before the shooting but not that an order was given. *Id.* Adams drove the car carrying the shooter and, Adams claimed, Kaid shot at the MacBallas "like two times." *Id.*

The defense advanced the theory, through the cross-examination of Michael Adams and in summation, that the shooting was really a personal matter between the Adams family and one of the targets of the shooting, known as Biggs. At trial, witness Michael Adams admitted that he knew Biggs from his "chilling with" Adams' cousin Cassiah Ingram, with whom Adams lived. (Trial Tr. 591-92). At some point before the shooting, Biggs physically attacked Ingram and shot in her direction. Adams and Ingram were obviously close. In the fevered moments while Biggs was shooting in Ingram's direction and otherwise menacing her, it was Michael Adams whom she phoned in a panic. (*Id.* at 593-94). (Adams testified that he heard gunshots over the phone. *Id.* at 594-95.) To escape Biggs, Ingram ran to Adams's apartment. (*Id.* at 596-97). Two weeks later, Adams moved to Elmira. (*Id.* at 597-98). The impetus for the move was Biggs's attack on Ingram. (*Id.* at 598). Johnson argued that this series of events underscored the likely motive for the shooting of Biggs – a personal conflict between a close member of Adams's family and Biggs.

The defense was prompted to pursue this theory by a statement that Biggs proffered to the government and that was supplied to the defense before trial. Biggs suggested to the government that the shooting had to do with his conflict with Ingram. Biggs told the government that, shortly before he was shot at, he received a text message from Ingram saying, "I'm sorry it had to be you." (ECF No. 646, Ex. A). As Michael Adams drove up to Biggs, Biggs caught a glimpse of the person sitting in the front passenger seat and believed it to be Ingram. (*Id.*). That

the shooting was the result of a personal conflict was further supported by the hearsay statement of Stephen Adams to Rosario that Stephen also shot at Biggs and Dummy. (*Id.*).

The defense asserted that Kaid did not do the shooting. Rather, it was witness Michael Adams or his brother Stephen Adams who shot at Biggs. (Trial Tr. at 619; *see* ECF No. 644 at 14). The defense posited that it was suspicious that, in proffer after proffer with the government, witness Michael Adams omitted the fact that his brother Stephen was present for the shooting. (Trial Tr. at 613). Michael Adams admitted on the stand that he did not want Stephen Adams to "get [into] more trouble." (Trial Tr. at 614).

When Michael Adams finally placed Stephen at the scene, Stephen had no active role in the shooting. This was the version that witness Michael Adams settled on at trial. (Tr. 560). But the defense suggested that this was not the true extent of Stephen's involvement. During summation, the defense suggested that Michael Adams' omission was an indication that Stephen was far more involved in the shooting, and possibly the perpetrator, than Michael Adams finally admitted he was.

> Q. . . . Isn't it true that it was just the three of you in that car that day?
>
> A. That's false.
>
> Q. And Cassiah was sitting in the front seat, isn't that true?
>
> A. No, that's false.
>
> Q. Isn't it true that you were protecting Stephen by leaving him out of your proffer sessions?
>
> A. That's true.
>
> Q. And isn't it true that you are protecting Cassiah now --
>
> A. No.
>
> Q. -- and leaving her out of the car?
>
> A. No.

(Trial Tr. at 619).

Aside from protecting his brother Stephen, Michael Adams proved himself to be a brazen liar. In at least one proffer meeting, Adams told the government that he had often witnessed Dummy in possession of guns and that, on the day that Dummy was shot at, Dummy first flashed a gun he was holding in his belt. (Tr. 3227.) But, under oath at trial on cross-examination, witness Adams denied making these statements. Instead, Adams told the jury that he had seen Dummy with a gun only once, inside a Chinese restaurant, (Tr. 599-600), and that he did not "remember" seeing Dummy with a gun on the night of the shooting, (*id.* at. 609-10; *see also id.* 323, 329-30).

Next, in a proffer meeting, Adams told the government that he gave the gun to Kaid when Kaid entered the car. (Tr. 3227.) But, at trial, Adams denied making that statement. (Tr. 617-18.) Instead, Adams told the jury that Zubearu Bettis had given the gun to Kaid. (*Id.*; *see also id.* at 327-28, 616.)

## ARGUMENT

By declaration dated March 7, 2021, Stephen Adams vindicates the defense's theory. He *admits that he was the shooter* and that the motive for the shooting was Biggs' physical assault of Cassiah Ingram. Specifically, Stephen Adams writes:

> [O]n the night of the "MacBalla shooting," no such order to shoot at "Dummy & Biggz" was given by Latique Johnson. I was in the car and I, Stephen Adams[,] pulled the trigger shooting at Dummy & Biggz, dude to the fact (victim-1) bashed my cousin wife (Cassiah) head against an ice machine in the corner store of 213th and Barnes Ave.[] a few nights prior.

(ECF No. 980-1).

"Relief under Rule 33 based on newly discovered evidence may be granted only upon a showing that (1) the evidence was newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the

-4-

evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." *United States v. Forbes*, 790 F.3d 403, 406–07 (2d Cir. 2015) (internal quotation and alteration marks omitted) (quoting *United States v. Owen*, 500 F.3d 83, 88 (2d Cir. 2007)).

Stephen Adams' proffered testimony is obviously material and unique new evidence. He plainly states what the defense could merely grasp at: that the motive for the shooting was personal and that someone connected to the Adams family, someone other than Kaid, did it. The jury was never presented with anything comparable to Stephen Adams' proffered testimony.

As the shooter, Stephen Adams' statement that Johnson never gave an order to shoot at Biggs and Dummy is exculpatory as to the government's theory that Johnson *did* give the order. The declaration is also exculpatory in that it vindicates the defense's position that the proffered motive for Kaid to do the shooting was nonsense. (*E.g.*, Trial Tr. at 3471-73).[1]

Finally, in order for Mr. Johnson to be found guilty of Count 3, the government had to prove that the shooting was done "for the purpose of gaining entrance to, maintaining a position in, or increasing a position in the charged racketeering enterprise." (Trial Tr. at 3650). The personal nature of the shooting strips it of its purported relationship to the gang. Thus, if credited, Stephen Adams's testimony would negate an indispensable element of Count 3.

---

[1] The prosecution's story was that Kaid had to prove his standing within the gang because he had tattled to an EMT that he had been shot by Thomas Morton and David Cherry. The theory went that Johnson ordered Kaid to do the shooting even though, at the time that Morton and Cherry shot Kaid, Cherry was attempting to take over the BHB and was, thus, Johnson's archrival. Cherry and Morton had not patched things up by the time Johnson purportedly ordered Kaid to shoot at Biggs and Dummy. The obvious question remains as to why Johnson would seek to punish a person (Kaid) for a deathbed identification of his shooters (Cherry and Morton) when the shooters were Johnson's archnemeses.

The information provided by Stephen Adams would have also undercut his brother's testimony, thus increasing the likelihood of an acquittal as to Count Three. The defense emphasized to the jury Michael Adams' multitude instances of inconsistent statements, evasiveness and selective and feigned loss of memory. In the time since trial, the Court has declined to credit Michael Adams' testimony to support a sentencing enhancement as to one Brandon Greene. (ECF No. 1025). Michael Adams was the only source of a purported attempted murder of David Cherry. The Court noted that Adams' testimony was implausible. (*Id.* at 3-4). Although new evidence may not be *merely* impeaching, the evidence here further weakens the government's case and strengthens the defense's.

The government's theory was convoluted and breaks down under a cursory examination. Its chief proponent was a witness who had repeatedly lied to the government to protect members of his family from legal trouble. Stephen Adams's testimony would have deeply undercut his brother's testimony and, thus, the government's case as to Count 3.

We note that the Court, in *dicta*, has stated that there is no reason to credit Stephen Adams' recent declaration. (ECF No. 1004 at 32 n.22). For that reason, a hearing at which Stephen Adams testifies under oath is imperative.

Dated:      Brooklyn, New York
            August 17, 2021

                                            Respectfully submitted,


                                            _____/s/ Ezra Spilke_____
                                            Ezra Spilke, Esq.
                                            *Counsel for Latique Johnson*
                                            1825 Foster Avenue, Suite 1K
                                            Brooklyn, NY 11230
                                            Tel: (718) 783-3682

TO:   Audrey Strauss
      United States Attorney
      Southern District of New York

        One Saint Johnson Plaza
        New York, N.Y. 10007
Attn:  Jessica Feinstein, Allison Nichols
        Assistant United States Attorneys